Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co., GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and                    Docket No.:          (        )
GEICO CASUALTY COMPANY,

                                    Plaintiffs,

                                                                       **Plaintiffs Demand a Trial**
              -against-                                                 **by Jury**

FAISAL MASOOD, D.C.,
MASOOD CHIROPRACTIC DIAGNOSTIC, P.C.,
GENTLE TOUCH CHIROPRACTIC CARE PLLC, and
JOHN DOE DEFENDANTS "1" THROUGH "10,"

                                    Defendants.
-----------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, Faisal Masood, D.C., Masood

Chiropractic Diagnostic, P.C., Gentle Touch Chiropractic Care PLLC, and John Doe Defendants

"1" through "10" (collectively, the "Defendants"), hereby allege as follows:

**NATURE OF THE ACTION**

1.     This action seeks to recover more than $300,000.00 that the Defendants wrongfully obtained from GEICO by submitting, or causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported patient examinations, nerve conduction velocity ("NCV") testing, electromyography ("EMG") studies, pain fiber nerve conduction studies ("PfNCS"), spinal ultrasound tests, chiropractic manipulations without anesthesia, "neuromuscular re-education" services, and chiropractic manipulations under anesthesia ("MUA") (collectively, the "Fraudulent Services"), which were allegedly provided to New York automobile accident victims insured by GEICO ("Insureds") and other insurers.

2.     Defendant Faisal Masood, D.C. ("Masood") is a chiropractor licensed to practice in New York who purports to own a series of chiropractic professional corporations, including Defendants Masood Chiropractic Diagnostic, P.C. ("Masood Chiropractic") and Gentle Touch Chiropractic Care PLLC ("Gentle Touch") (collectively, the "PC Defendants"), that have billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  The PC Defendants purport to be legitimate professional corporations. However, they are operated on a transient basis, do not maintain any stand-alone practices, do not have any patients of their own, and do not provide any legitimate or medically necessary healthcare services.

3.     Masood, along with John Doe Defendants "1" through "10," perpetrated the fraudulent scheme using illegal referral and kickback arrangements to provide the PC Defendants access to a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system solely for financial gain without regard to genuine patient care.

4.    GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement totaling at least $1,500,000.00 in pending no-fault insurance claims for Fraudulent Services that have been submitted by or on behalf of the PC Defendants because:

(i)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the levels and types of healthcare services that were purportedly provided in order to inflate the charges submitted to GEICO;

(iii)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal referral and kickback arrangements; and

(iv)    in many instances, the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of Gentle Touch and Masood Chiropractic, and therefore were not reimbursable.

5.    The Defendants fall into the following categories:

(i)    The PC Defendants, Gentle Touch and Masood Chiropractic, are separate New York entities through which the Fraudulent Services were purportedly performed and were billed to automobile insurance companies, including GEICO.

(ii)    Defendant Masood is a chiropractor licensed to practice chiropractic in New York, who purports to own the PC Defendants, and who purported to perform some of the Fraudulent Services.

(iii)    John Doe Defendants "1" through "10" are individuals who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.      As discussed in further detail herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the levels and types of services that were purportedly provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of Masood or the PC Defendants.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the PC Defendants.

8.      The charts annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims for the Fraudulent Services that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO under the names of the PC Defendants.

9.      The Defendants' fraudulent scheme commenced in or around April 2017 and continues uninterrupted through the present day, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services.

10.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $300,000.00.

## THE PARTIES

### I.      Plaintiffs

11.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.      Defendant Masood resides in and is a citizen of New York. Masood was licensed to practice chiropractic in New York on July 22, 2010 and serves as the nominal or "paper" owner of the PC Defendants.

13.      Defendant Gentle Touch is a New York professional service limited liability company organized on or about April 24, 2017, with its principal place of business in New York, and purports to be owned and controlled by Masood. Gentle Touch has been used by Masood and John Doe Defendants "1" through "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

14.      Defendant Masood Chiropractic is a New York professional corporation incorporated on or about July 10, 2019, with its principal place of business in New York, and purports to be owned and controlled by Masood. Masood Chiropractic has been used by Masood and John Doe Defendants "1" through "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

15.      Upon information and belief, John Doe Defendants "1" through "10" reside in and are citizens of New York. John Doe Defendants "1" through "10" are unlicensed, non-professional individuals and/or entities, presently not identifiable, who knowingly participated in the fraudulent

scheme by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

19.     GEICO underwrites automobile insurance in New York.

20.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act

(N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits" or "PIP Benefits") to Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

22.     In New York, an Insured can assign his or her right to No-Fault Benefits to the providers of healthcare goods and services in exchange for those goods and services.

23.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500" form).

24.     Pursuant to the No-Fault Laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

26.     In New York, only a licensed chiropractor may practice chiropractic, may own and control a professional corporation authorized to practice chiropractic and, absent statutory exceptions not applicable in this case, may derive economic benefit from chiropractic services.  Unlicensed individuals in New York may not practice chiropractic, may not own or control a professional corporation authorized to practice chiropractic, may not employ or supervise chiropractors or physicians, and, absent statutory exceptions not applicable in this case, may not derive economic benefit from chiropractic services.

27.     New York law prohibits licensed healthcare services providers, including chiropractors, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

28.     New York law prohibits unlicensed persons not authorized to practice a profession, like chiropractic, from practicing the profession and from sharing in the fees for professional services.  See, e.g., New York Education Law §§ 6512; 6530(11), and (19).

29.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered, or allows unlicensed laypersons to share in the fees for the professional services.

30.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in

New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

31.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule ("Fee Schedule").

32.     When a healthcare provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

33.     Furthermore, pursuant to the New York no-fault insurance laws, only healthcare providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits.  There are statutory and regulatory prohibitions against the payment of No-Fault Benefits to anyone other than the patient or his or her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant … shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law….

34.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services.  Under the No-Fault Laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services

were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

35.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO and to all other automobile insurers must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     An Overview of the Defendants' Fraudulent Scheme

36.     Beginning in 2017 and continuing through the present day, Masood, the PC Defendants, and John Doe Defendants "1" through "10" (collectively, the "Defendants") orchestrated and executed a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers millions of dollars in fraudulent billing for medically unnecessary, illusory, and otherwise non-reimbursable services (i.e., the Fraudulent Services) resulting in the payment of No-Fault Benefits to the Defendants that they were never entitled to receive.

37.     The Fraudulent Services billed under the names of the PC Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not legally permitted to render healthcare services.

38.     Masood did not operate the PC Defendants at any single, fixed location.

39.     Masood did not market the existence of either of the PC Defendants to the general public.

40.     Masood did not advertise for patients, and never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of either of the PC Defendants.

41.     Masood did not have his own patients and did nothing to create a patient base.

42.     Masood did virtually nothing that would be expected of the owner of legitimate chiropractic entities to develop their reputations and attract patients.

43.     Instead, Masood operated the PC Defendants on an itinerant basis from various "no-fault medical clinics" primarily located in Brooklyn, Queens, and Bronx, where the PC Defendants received steady volumes of patients through no efforts of their own, including at the following locations (collectively, the "Clinics"):

- 107-48 Guy R. Brewer Boulevard, Jamaica
- 111-20 Queens Boulevard, Forest Hills
- 1122A Coney Island Avenue, Brooklyn
- 1655 Richmond Avenue, Staten Island
- 1735 Pitkin Avenue, Brooklyn
- 180-09 Jamaica Avenue, Jamaica
- 1849 Utica Avenue, Brooklyn
- 1975 Linden Boulevard, Elmont
- 222-01 Hempstead Avenue, Jamaica
- 245 Rockaway Avenue, Valley Stream
- 2488 Grand Concourse, Bronx
- 2625 Atlantic Avenue, Brooklyn
- 3250 Westchester Avenue, Bronx
- 3310 101st Street, Corona
- 430 West Merrick Road, Valley Stream
- 60 Belmont Avenue, Brooklyn
- 615 Seneca Avenue, Ridgewood
- 79-45 Metropolitan Avenue, Middle Village
- 8012 Jamaica Avenue, Jamaica
- 9208 Jamaica Avenue, Woodhaven

**B.** **The Defendants' Illegal Kickback and Referral Relationships**

44.     Masood and the PC Defendants provided no medically necessary services to the patients at the Clinics.

45.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics were actually organized to supply "one-stop shops" for no-fault insurance fraud.

46.     The Clinics provided facilities for the PC Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

47.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

48.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 2625 Atlantic Avenue in Brooklyn from a "revolving door" of approximately 100 purportedly different healthcare providers, at least 35 of which purport to be chiropractic professional corporations. The billing submitted to GEICO from this Clinic included billing for the Fraudulent Services purportedly performed by Masood's chiropractic professional corporations, Gentle Touch and Masood Chiropractic.

49.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 79-45 Metropolitan Avenue in Middle Village from a "revolving door" of approximately 100 purportedly different healthcare providers, at least 20 of which purport to be chiropractic professional corporations. The billing submitted to GEICO from this Clinic included billing for the Fraudulent Services purportedly performed by Masood's chiropractic professional corporations, Gentle Touch and Masood Chiropractic.

50.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 60 Belmont Avenue in Brooklyn from a "revolving door" of approximately 90 purportedly different healthcare providers, at least 20 of which purport to be chiropractic professional corporations. The billing submitted to GEICO from this Clinic included billing for the Fraudulent Services purportedly performed by Masood's chiropractic professional corporations, Gentle Touch and Masood Chiropractic.

51.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 615 Seneca Avenue in Ridgewood from a "revolving door" of over 100 purportedly different healthcare providers, at least 30 of which purport to be chiropractic professional corporations. The billing submitted to GEICO from this Clinic included billing for the Fraudulent Services purportedly performed by Masood's chiropractic professional corporation, Masood Chiropractic.

52.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 222-01 Hempstead Avenue in Jamaica from a "revolving door" of over 65 purportedly different healthcare providers, at least 15 of which purport to be chiropractic professional corporations. The billing submitted to GEICO from this Clinic included billing for the Fraudulent

Services purportedly performed by Masood's chiropractic professional corporation, Masood Chiropractic.

53.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient bases at the Clinics.

54.     Masood, in order to obtain access to the Clinics' patient bases (i.e., access to Insureds), entered into illegal financial arrangements with unlicensed persons who "brokered" or "controlled" access to the patients who were treated, or who purported to be treated, at the Clinics.

55.     The financial arrangements that Masood and the PC Defendants entered into included the payment of fees ostensibly to "rent" space or personnel from the Clinics or fees for ostensibly legitimate services such as marketing, advertising, consulting, billing, and collection services.  In fact, however, these were "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to the PC Defendants for medically unnecessary services at the Clinics.

56.     In furtherance of the Defendants' fraudulent kickback and referral scheme, multiple checks issued to Masood Chiropractic and Gentle Touch were illegally exchanged for cash at a check-cashing facility in New Jersey – Cambridge Clarendon Financial Service, LLC d/b/a United Check Cashing ("Cambridge Clarendon").

57.     Virtually all of these checks were exchanged for cash by an individual named Alla Kuratova, who was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.

58.     From approximately May 2017 through May 2021, Kuratova illegally exchanged over $35 million worth of checks, made out to over 1,000 different companies, for cash at Cambridge Clarendon.

59.     The Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the PC Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

60.     The amount of the kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to the PC Defendants for the purported medically unnecessary services.

61.     Masood had no genuine chiropractor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the PC Defendants. Instead, the Insureds were simply directed by the Clinics and the unlicensed persons associated therewith to subject themselves to treatment by whichever chiropractor or technician was working for the PC Defendants that day, because of the kickbacks paid by Masood and the PC Defendants.

62.     The unlawful kickback and financial arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants realized significant financial benefit from these relationships because without access to the Insureds, the Defendants would not have had the ability to execute their fraudulent treatment and billing protocol and bill GEICO and other no-fault insurers.

63.     Masood at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

64.     In fact, Masood decided to incorporate a series of chiropractic entities, splitting the Defendants' billing for the Fraudulent Services across the various chiropractic entities in order to limit the amount of billing being submitted by each PC Defendant.

65.     The Defendants conducted their scheme through the two chiropractic entities using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted

through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

### C.    The Defendants' Fraudulent Treatment and Billing Protocol

66.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentation.

67.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

68.    The predetermined protocol involved providing, or purporting to provide, a series of medically unnecessary, illusory and fraudulent services including bogus patient examinations, nerve conduction velocity ("NCV") testing, electromyography ("EMG") studies, pain fiber nerve conduction studies ("PfNCS"), spinal ultrasound tests, chiropractic manipulations without anesthesia, "neuromuscular re-education" services, and chiropractic manipulations under anesthesia ("MUA") (collectively, the "Fraudulent Services") designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insured.

69.    No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol further described herein to proceed under his or her auspices.

70.    The Defendants perpetrated the fraudulent treatment and billing protocol described below because they sought to illegally profit from the fraudulent billing submitted to GEICO and other insurers.

**1.  The Fraudulent Charges for Initial Chiropractic Examinations and Consultations**

71.    Upon receiving a patient referral pursuant to the kickbacks that Masood and the PC Defendants paid to the owners, operators, and/or healthcare professionals associated with the Clinics, Masood and the PC Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1" and "2" with an initial chiropractic examination or consultation.

72.    Masood and the PC Defendants virtually always purported to perform the initial chiropractic examinations and consultations at the Clinics where they obtained their referrals, rather than at any stand-alone practice, consistent with the fact that the initial chiropractic examinations and consultations were performed pursuant to the kickbacks that Masood and the PC Defendants paid at the Clinics in coordination with John Doe Defendants "1" through "10.".

73.    The initial chiropractic examinations and consultations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise unreimbursable EMG and NCV tests, PfNCS tests, ultrasound tests, "neuromuscular re-education" therapy services, chiropractic manipulations without anesthesia, and MUAs.

74.    Typically, either Masood or another individual associated with Masood and the PC Defendants purported to perform the initial chiropractic examinations and consultations, which were then billed to GEICO through one of the PC Defendants.

75.    The Defendants virtually always billed the initial chiropractic examinations to GEICO under current procedural terminology ("CPT") codes 99203 or 99204, typically resulting in charges of between $54.74 and $148.69.

76.    The Defendants virtually always billed the initial chiropractic consultations to GEICO under CPT code 99244, typically resulting in charges of $124.62.

77.     The charges for the initial chiropractic examinations and consultations were fraudulent in that they were medically unnecessary and were performed pursuant to the kickbacks that Masood and the PC Defendants paid at the Clinics in coordination with John Doe Defendants "1" through "10," not to treat or otherwise benefit the Insureds.

78.     Furthermore, the Defendants' charges for the initial chiropractic examinations and consultations were fraudulent in that they misrepresented the extent of the examinations.

79.     For example, in virtually every claim identified in Exhibits "1" and "2" for initial chiropractic examinations and consultations under CPT codes 99203, 99204, and 99244, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families.

80.     The use of CPT code 99203 typically requires that a chiropractor spend 30 minutes of face-to-face time with the Insured and/or the Insured's family.

81.     The use of CPT code 99204 typically requires that a chiropractor spend 45 minutes of face-to-face time with the Insured and/or the Insured's family.

82.     The use of CPT code 99244 typically requires that a chiropractor spend 60 minutes of face-to-face time with the Insured and/or the Insured's family.

83.     Though the Defendants typically billed for their initial chiropractic examinations and consultations under CPT codes 99203, 99204, and 99244, no chiropractor or other healthcare professional associated with the PC Defendants spent 30 minutes, let alone 45 or 60 minutes, on an initial chiropractic examination or consultation.

84.     Rather, the initial chiropractic examinations and consultations in the claims identified in Exhibits "1" and "2" rarely lasted longer than 10 to 15 minutes.

85. In keeping with the fact that the initial chiropractic examinations and consultations rarely lasted more than 10-15 minutes, Masood and the PC Defendants used checklist forms in purporting to conduct the initial chiropractic examinations and consultations.

86. The checklist forms that Masood and the PC Defendants used in conducting the initial chiropractic examinations and consultations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

87. All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

88. These interviews and examinations did not require the Defendants to spend more than 10 to 15 minutes of face-to-face time with the Insureds during the putative initial chiropractic examinations and consultations.

89. In addition, pursuant to the Fee Schedule, when the Defendants submitted or caused to be submitted charges for initial chiropractic examinations under CPT codes 99203, 99204, and 99244, they falsely represented that a chiropractor associated with one of the PC Defendants: (i) took a "detailed" patient history and conducted a "detailed" physical examination as required under CPT code 99203; or (ii) took a "comprehensive" patient history and conducted a "comprehensive" physical examination as required under CPT codes 99204 and 99244.

> a. **Misrepresentations Regarding "Comprehensive" and "Detailed" Patient Histories**

90. Pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations and consultations under CPT codes 99244 and 99204, they represented that they took a "comprehensive" patient history.

91. In addition, according to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, they represented that they took a "detailed" patient history.

92. Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

93. Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

94. The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)     constitutional symptoms (e.g., fever weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)   allergic/immunologic.

95.     When the Defendants billed for the initial examinations and consultations under CPT codes 99244 and 99204, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations/consultations.

96.     In fact, the Defendants did not take a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations and consultations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

97.     Furthermore, pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

98.     When the Defendants billed for the initial examinations under CPT code 99203, they falsely represented that they took a "detailed" patient history from the Insureds they purported to treat during the initial examinations.

99.     In fact, the Defendants did not take a "detailed" patient history from the Insureds during the initial examinations, inasmuch as they did not review systems related to the patients' presenting problems and did not conduct any review of a limited number of additional systems.

100.    Rather, after purporting to provide the initial examinations and consultations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

101.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

### b.    Misrepresentations Regarding "Comprehensive" and "Detailed" Physical Examinations

102.    Moreover, pursuant to the Fee Schedule, an examination billed under CPT code 99204 or 99244 requires a "comprehensive" physical examination, which requires that the healthcare services provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single organ system.

103.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a general examination of multiple patient organ systems unless the chiropractor has documented findings with respect to at least eight organ systems.

104.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a complete examination of a patient's musculoskeletal system unless the chiropractor has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)      examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)     inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)      mental status, including orientation to time, place and person, as well as mood and affect.

105.    When the Defendants billed for the initial examinations and consultations under CPT code 99204 or 99244, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations and consultations.

106.    In fact, the Defendants did not conduct a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.

107.    For instance, Defendants did not conduct any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

108.    Furthermore, although the Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete" because they failed to document:

(i)       at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)      the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)     examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in the neck, axillae, groin, and/or other location;

(v) examination of gait and station;

(vi) examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii) inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and/or

(ix) mental status, including orientation to time, place and person, as well as mood and affect.

109. Pursuant to the Fee Schedule, an examination billed under CPT code 99203 requires a "detailed" physical examination, which requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

110. Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor has documented findings with respect to:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii) examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in the neck, axillae, groin, and/or other location;

(v) brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

111.    When the Defendants billed for the initial examinations under CPT code 99203, they falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations.

112.    In fact, the Defendants did not conduct a detailed patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

### 2.    The Fraudulent Charges for Follow-Up Examinations

113.    In addition to the fraudulent initial chiropractic examinations and consultations, Masood and Gentle Touch purported to subject some of the Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocols.

114.    Masood and Gentle Touch typically billed the follow-up examinations to GEICO under CPT code 99212.

115.    Like the Defendants' charges for the initial chiropractic examinations and consultations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Defendants paid at the Clinics and the predetermined

fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

### 3.    The Fraudulent Charges for Electrodiagnostic Testing

116.    As set forth in Exhibits "1" and "2", the Defendants also purported to subject many Insureds to a series of medically unnecessary and useless NCV, EMG, and PfNCS tests (collectively, "EDX" tests).

117.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed pursuant to the kickbacks that Masood and the PC Defendants paid at the Clinics and the predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

### a.    The Human Nervous System and Electrodiagnostic Testing

118.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

119.    Two primary functions of the nervous system are to: (i) collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain; and (ii) transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

120.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the

body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

121. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

122. NCV tests and EMG tests are forms of electrodiagnostic tests which were purportedly provided by the Defendants because such testing was medically necessary to determine whether the Insureds had radiculopathies.

123. PfNCS tests are purportedly a form of electrodiagnostic testing which were purportedly provided by the Defendants because such testing was medically necessary to determine whether the Insureds had radiculopathies.

124. The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

125. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations; the American Academy of Neurology, and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "3."

126.     The Recommended Policy does not identify PfNCS tests as having any documented utility in diagnosing radiculopathies. See Exhibit "3." In fact, PfNCS tests are not recognized as having any value in the diagnosis of any medical condition.

### b.     The Fraudulent NCV Tests

127.     NCV tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization or "firing" of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

128.     An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

129.     In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

130.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

131.     F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies are generally used to derive the time required for an electrical impulse to travel from a stimulus site

on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV tests are designed to evaluate nerve conduction in nerves within a limb.

132.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. See Exhibit "3."

133.    In an attempt to extract the maximum billing out of each Insured who purportedly received NCV tests, the Defendants routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

134.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of between 4 and 10 motor nerves; (ii) NCV tests of between 4 and 16 sensory nerves; and (iii) at least two H-reflex studies.

135.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits physicians in the New York metropolitan area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve with F-wave in any limb on which NCV testing is performed; and (iii) $119.99 under CPT codes 95934 and 95936 for each H-reflex test that is performed on the nerves of any limb.

136.    However, the Defendants routinely submitted billing to GEICO for NCV testing exceeding $2,000.00 per Insured.

137.    For example:

(i)    On or about November 17, 2018, the Defendants purported to provide: (i) 10 motor nerve NCV tests with F-wave studies; (ii) 14 sensory nerve NCV tests; and (iii) two H-reflex studies to an Insured named LM. The

Defendants then billed GEICO approximately $3,395.16 for these tests through Gentle Touch.

(ii)     On September 17, 2018, the Defendants purported to provide: (i) 10 motor nerve NCV tests with F-wave studies; (ii) 12 sensory nerve NCV tests; and (iii) four H-reflex studies to an Insured named MC. The Defendants then billed GEICO approximately $2,340.98 for these tests through Gentle Touch.

(iii)    On March 27, 2019, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 16 sensory nerve NCV tests; and (iii) two H-reflex studies to an Insured named MB. The Defendants then billed GEICO approximately $2,240.14 for these tests through Gentle Touch.

(iv)    On August 8, 2019, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 16 sensory nerve NCV tests; and (iii) two H-reflex studies to an Insured named CZ. The Defendants then billed GEICO approximately $2,240.14 for these tests through Gentle Touch.

(v)     On February 6, 2019, the Defendants purported to provide: (i) 10 motor nerve NCV tests with F-wave studies; (ii) 12 sensory nerve NCV tests; and (iii) two H-reflex studies to an Insured named TM. The Defendants then billed GEICO approximately $2,176.58 for these tests through Gentle Touch.

(vi)    On January 14, 2020, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 2 motor nerve NCV tests without F-wave studies; (iii) 14 sensory nerve NCV tests; and (iv) two H-reflex studies to an Insured named ST. The Defendants then billed GEICO approximately $2,240.40 for these tests through Masood Chiropractic.

(vii)   On January 14, 2020, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 2 motor nerve NCV tests without F-wave studies; (iii) 14 sensory nerve NCV tests; and (iv) two H-reflex studies to an Insured named JH. The Defendants then billed GEICO approximately $2,240.40 for these tests through Masood Chiropractic.

(viii)  On January 14, 2020, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 2 motor nerve NCV tests without F-wave studies; (iii) 14 sensory nerve NCV tests; and (iv) two H-reflex studies to an Insured named LF. The Defendants then billed GEICO approximately $2,240.40 for these tests through Masood Chiropractic.

(ix)    On January 15, 2020, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 2 motor nerve NCV tests without F-wave studies; (iii) 14 sensory nerve NCV tests; and (iv) two H-reflex studies

to an Insured named TC. The Defendants then billed GEICO approximately $2,240.40 for these tests through Masood Chiropractic.

(x)    On January 29, 2020, the Defendants purported to provide: (i) 8 motor nerve NCV tests with F-wave studies; (ii) 2 motor nerve NCV tests without F-wave studies; (iii) 14 sensory nerve NCV tests; and (iv) two H-reflex studies to an Insured named JT. The Defendants then billed GEICO approximately $2,240.40 for these tests through Masood Chiropractic.

138.    Defendants routinely purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds had radiculopathies or any other medical condition.

139.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

140.    In a legitimate clinical setting, this decision is determined based upon a thorough history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

141.    Thus, the nature and number of the peripheral nerves as well as the type of nerve fibers tested with NCV tests should vary from one patient to the next.

142.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCV tests] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

143.    This concept also is emphasized in the CPT Assistant, which states that "[p]re-set protocols automatically testing a large number of nerves are not appropriate."

144.    Even so, the Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

145.    Instead, they applied a fraudulent treatment protocol and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the NCV test claims identified in Exhibits "1" and "2."

146.    Though the NCV tests are allegedly provided to Insureds in order to determine whether the Insureds suffered from radiculopathies, the Defendants did not perform adequate neurological histories and examinations to create a foundation for the NCV testing. In actuality, the NCV tests were provided to the Insureds – to the extent that they were provided at all – as part of the predetermined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

147.    The cookie-cutter approach to the NCV tests that Defendants purported to provide to Insureds was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

### c.    The Fraudulent EMG Tests

148.    As part of their predetermined fraudulent treatment and billing protocol, the Defendants also purported to provide medically unnecessary EMG tests to virtually every Insured who received NCV tests.

149.    EMG tests involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such

muscle. The electrical activity in each muscle tested is then compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

150.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.  See Exhibit "3."

151.    The Defendants purported to provide and/or perform EMG tests on Insureds to determine whether the Insureds suffered from radiculopathies. In actuality, the EMG tests were provided – to the extent they were provided at all – as part of the Defendants' predetermined fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

152.    There are many different muscles in the arms and legs that can be tested using EMG tests. A healthcare provider's decision as to the number of limbs and which muscles to test in each limb should be tailored to each Insured's unique circumstances.

153.    In a legitimate clinical setting, this decision is based upon a thorough history and physical examination of the individual patient, as well as the real-time results obtained from the EMG tests as they are performed on each specific muscle.

154.    As a result, the quantity of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient to patient.

155.    The Defendants did not tailor the EMG tests that they purported to perform to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs on each of the patients, without regard for the patients' individual presentation.

156.     Furthermore, even if there was any need for the EMG tests, the nature and number of the EMG tests that the Defendants purported to provide and/or perform often grossly exceeded the maximum number of limbs tested (i.e., two limbs) that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

157.     Nevertheless, the Defendants routinely purported to perform EMG tests on all four limbs on the Insureds in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO, solely to maximize the profits that Defendants could reap from each Insured.

158.     In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the Defendants' EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

159.     Further to the fact that the Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the Defendants virtually always performed or purported to perform the NCV tests and EMG tests immediately following the initial examination or consultation.

160.     A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the Defendants to spend at least two hours with each patient.

161.     The fact that each of the patients purportedly subjected to the fraudulent NCV tests and EMG tests set aside two hours to receive a neurological examination and NCV tests and EMG tests indicates that either: (i) the patients knew in advance of the visit that they were to receive the NCV tests and EMG tests because the NCV tests and EMG tests are rendered pursuant to a

predetermined treatment protocol; or (ii) the Fraudulent Services were not actually performed as billed.

### d.    The Fraudulent PfNCS Tests

162.    As part of their fraudulent, predetermined treatment protocol and kickback scheme, the Defendants purported to subject many Insureds to medically unnecessary PfNCS tests.

163.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' predetermined treatment protocol and improper financial and referral arrangements between the Defendants and others.

164.    The Defendants billed the PfNCS tests through the PC Defendants to GEICO as multiple charges under CPT codes 95999 or 95904, typically resulting in multiple charges totaling more than $2,000.00 for each Insured on whom the PfNCS testing was purportedly performed.

### (i)    Legitimate Tools for Radiculopathy Diagnosis

165.    The Defendants purportedly provided the PfNCS tests to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

166.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and in the nerve roots (i.e., radiculopathies). These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

167.    Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) there is suspected nerve damage; (ii) the damage cannot be fully

evaluated through a physical history and examination; and (iii) the tests are necessary to determine an appropriate treatment plan.

168.     MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

**(ii)     The Medically Useless PfNCS Tests**

169.     The PfNCS test is a type of sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

170.     PfNCS tests are performed by administering an electrical stimulus at specific skin sites to elicit a perception in the arms, legs, hands, feet and/or face. The voltage is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" are then made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

171.     If a patient's sensation threshold is greater than the purported normal range of voltage required to evoke a sensation, it allegedly indicates that the patient has a *hypo*esthetic condition (i.e., the patient's sensory nerves exhibit decreased function). If the voltage required for the patient to announce that he or she perceives a sensation is less than the supposed normal range of intensity required to evoke a sensation, it allegedly indicates that the patient has a *hyper*esthetic condition (i.e., the patient's sensory nerves are in a hypersensitive state).

172.     However, there are no reliable peer-reviewed data that establish normal response ranges in PfNCS testing.

173.    Specifically, there is no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a sensation using a PfNCS test device.  Given the lack of evidence setting forth normal ranges of intensity required to evoke a sensation from the use of a PfNCS test device, it is impossible to determine whether an Insured's personal PfNCS test results are normal or abnormal.

174.    Even if evidence existed that set forth normal ranges of intensity required to evoke a sensation using a PfNCS test device, there is an absence of reliable evidence proving that a sensation threshold greater than the normal range indicates a hypoesthetic sensory nerve condition, and that a sensation threshold less than the normal range indicates a hyperesthetic sensory nerve condition.

175.    Further, even if an atypical sensation threshold indicated either a hypoesthetic or hyperesthetic sensory nerve condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from PfNCS tests. Indeed, numerous pathological and physiological conditions other than peripheral nerve damage can cause hypoesthesia and hyperesthesia.

176.    What is more, even if PfNCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)     no reliable evidence proves that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    no reliable evidence proves that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)   no reliable evidence proves that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; and

(iv)   PfNCS tests do not provide any information regarding the motor nerves or motor nerve roots, which are just as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident.

177.   Thus, no legitimate medical evidence supports the conclusion that PfNCS tests are in any way useful, let alone medically necessary, to diagnose neuropathies in general, or radiculopathies in particular.

178.   Even though the Defendants purported to subject many Insureds to PfNCS tests to supposedly diagnoses radiculopathies, the PfNCS tests were also medically useless because many Insureds who purportedly received the PfNCS tests also received NCV tests, EMG tests, and/or MRIs prior to or at about the same time as the PfNCS tests.

179.   Even if the PfNCS tests purportedly provided by the Defendants had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and/or MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the PfNCS tests that the Defendants purported to provide.

180.   The supposed primary benefit of the PfNCS tests is that they can allegedly diagnose abnormalities in the sensory nerves less than 14 to 21 days following an accident, which is earlier than NCV tests and EMG tests can be used to effectively diagnose nerve damage following an accident.

181.   However, the Defendants frequently purported to provide PfNCS tests to an Insured either *after* the Insured received NCV tests and EMG tests, or *contemporaneously* with the NCV tests and EMG tests, negating any alleged benefit of PfNCS testing.

182.   For example:

(i)   On January 23, 2019, an Insured named WC was purportedly subjected to NCV tests and EMG tests purportedly performed by Masood at Gentle Touch. Then, on February 12, 2019, Masood purported to provide PfNCS

tests to WC at Gentle Touch despite the fact that WC had already purportedly received NCV tests and EMG tests.

(ii)     On February 6, 2019, an Insured named TM was purportedly subjected to NCV tests and EMG tests purportedly performed by Masood at Gentle Touch. Then, on February 12, 2019, Masood purported to provide PfNCS tests to TM at Gentle Touch despite the fact that TM had already purportedly received NCV tests and EMG tests.

(iii)    On November 12, 2019, an Insured named DJ was purportedly subjected to NCV tests and EMG tests. Then, on March 10, 2020, Masood purported to provide PfNCS tests to DJ at Masood Chiropractic despite the fact that DJ had already purportedly received NCV tests and EMG tests.

(iv)     On December 11, 2019, an Insured named RH was purportedly subjected to NCV tests and EMG tests. Then, on February 14, 2020, Masood purported to provide PfNCS tests to RH at Masood Chiropractic despite the fact that RH had already purportedly received NCV tests and EMG tests.

(v)      On September 10, 2019, an Insured named AW was purportedly subjected to NCV tests and EMG tests. Then, on February 11, 2020, Masood purported to provide PfNCS tests to AW at Masood Chiropractic despite the fact that AW had already purportedly received NCV tests and EMG tests.

183.     Notably, the Centers for Medicare & Medicaid Services ("CMS") have determined that PfNCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies and radiculopathies, and are therefore not compensable.

184.     Further to the fact the Defendants' putative PfNCS tests were medically unnecessary is that the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for PfNCS tests.

185.     Further to the fact that the Defendants' purported PfNCS tests were medically useless is that the putative "results" of the PfNCS tests were not incorporated into the Insureds' individual treatment plans, and the PfNCS tests had no genuine role in the treatment or care of the Insureds.

### (iii) Each of the Two Primary PfNCS Test Device Manufacturers Claims the Other is a Fraud

186. Until 2004, at about the same time that CMS was considering the medical benefits of PfNCS testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of PfNCS tests, the two primary manufacturers of sensory nerve conduction threshold devices (i.e., PfNCS test devices) were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

187. Neurotron, Inc. manufactured a device called the "Neurometer." Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000." While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differed, each of the devices purported to provide quantitative data on sensory nerve conduction thresholds.

188. In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and rebranded its Medi-Dx 7000 device as the "Axon-II."

189. Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

190. Neuro Diagnostic Associates, Inc. claims that the Neurometer does not produce valid data or results and has been fraudulently marketed. For its part, Neurotron Inc. has asserted the same claims regarding Neuro Diagnostic Associates, Inc.'s Medi-Dx 7000/Axon-II.

191. Upon information and belief, to the extent that the Defendants actually provided any PfNCS testing on Insureds, they were provided using either a Neurometer or Axon-II.

**4.    The Fraudulent Charges for Spinal Ultrasound/Sonogram Tests**

192.    As set forth in Exhibit "2," Masood and Masood Chiropractic also purported to subject many Insureds to medically unnecessary and medically useless spinal ultrasound/sonogram tests.

193.    For these services, Masood Chiropractic typically billed GEICO for multiple charges under CPT codes 76999, 76881, 76536 and/or 76856, resulting in total billed amounts ranging from approximately $995.00 to more than $1,500.00 per Insured.

194.    Ultrasound/sonogram is an imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves that are passed into the body. Physicians commonly use this technique for a number of appropriate medical imaging purposes, such as the investigation of abdominal and pelvic masses, cardiac echocardiography, and prenatal fetal imaging.

195.    There is no medical support for the use of spinal ultrasound/sonogram tests in the evaluation of patients with back pain or radicular symptoms. The ultrasound/sonogram testing procedure is worthless and of no clinical value in the manner used by Defendants to purportedly diagnose and treat Insureds presenting with back pain or radicular symptoms, allegedly resulting from motor vehicle accidents.

196.    The American Institute of Ultrasound Medicine ("AIUM"), which consists of thousands of healthcare professionals and is dedicated to advancing the safe and effective use of ultrasound medicine, determined that, in relevant part: "the use of non-operative spinal/paraspinal ultrasound in adults…for diagnostic evaluation…including pain or radiculopathy syndromes, and for monitoring of therapy has no proven clinical utility."  See Exhibit "4."

197.    Similarly, the American Academy of Neurology ("AAN") issued a report that evaluated the use of spinal ultrasound for diagnosing back pain and radicular disorders. The report concluded that there is no support for the use of diagnostic ultrasound in the evaluation of patients with back pain or radicular symptoms. The procedure cannot be recommended for use in the clinical evaluation of such patients. See Exhibit "5."

198.    Consistent with the above-referenced authorities, the New York State Workers' Compensation Board Mid and Low Back Injury Medical Treatment Guidelines also state that "Diagnostic ultrasound is not recommended for patients with back pain." See Exhibit "6."

199.    Despite the lack of medical value or medical utility in the context of no-fault automobile accident victims suffering spinal/paraspinal injuries, the Defendants have routinely submitted or caused to be submitted thousands of dollars in fraudulent billing to GEICO for spinal and paraspinal ultrasound/sonogram tests as part of the Fraudulent Services.

### 5.   The Fraudulent Charges for Chiropractic Manipulations Without Anesthesia

200.    As set forth in Exhibit "1", based upon the fraudulent, predetermined "diagnoses" provided during the initial chiropractic examinations, Masood and Gentle Touch purported to subject Insureds to many months of medically unnecessary in-office chiropractic treatments.

201.    Like the Defendants' other charges billed to GEICO for the Fraudulent Services, the charges for the chiropractic manipulations without anesthesia were fraudulent in that the services were medically unnecessary and were performed pursuant to the illegal kickbacks that Masood and Gentle Touch paid to the Clinics and the predetermined fraudulent protocols, not to treat or otherwise benefit the Insureds.

202.    Virtually none of the Insureds on whom Masood and Gentle Touch purported to perform the chiropractic manipulations without anesthesia suffered from any significant injuries

or continuing health problems as a result of the relatively minor motor vehicle accidents in which they were involved or purported to be involved.

203. Further to the fact that most Insureds in the claims identified in Exhibit "1" were not seriously injured in their minor automobile accidents and suffered from no significant injuries or continuing health problems as the result of their accidents, is that they typically did not visit a hospital following their accidents or were otherwise observed on an outpatient basis for a few hours at a hospital and released with an ordinary sprain or strain diagnosis.

204. Ordinary strains and sprains virtually always resolve after a brief course of conservative treatment, or with no treatment at all.

205. Even so, and as set forth in Exhibit "1", Masood and Gentle Touch routinely purported to provide the Insureds with numerous individual chiropractic treatments, often spanning several months, despite the fact that the Insureds did not require them.

### 6. The Fraudulent Charges for Neuromuscular Re-Education

206. As part and parcel of the Fraudulent Services, in an attempt to maximize the fraudulent billing that the Defendants submitted or caused to be submitted to GEICO, Masood and Gentle Touch purported to provide many of the Insureds who received chiropractic manipulations without anesthesia with "neuromuscular re-education" on each treatment visit.

207. Masood and Gentle Touch typically billed GEICO $22.48 for the purported "neuromuscular re-education" services under CPT code 97112. Because Masood and Gentle Touch typically billed for neuromuscular re-education on each date that the Insureds who

purportedly received this service also received in-office chiropractic treatments, Masood and Gentle Touch typically billed hundreds of dollars for neuromuscular re-education per Insured.

208.     Neuromuscular re-education is used to re-educate and retrain a body part to perform a function/task that the body part absolutely was ready to do in its pre-injury state. For example, this might include re-teaching the hand to twist a doorknob or grasp a cup.

209.     Broadly speaking, neuromuscular re-education is typically used following a neurological trauma such as a stroke.

210.     Neuromuscular re-education, most assuredly, is not medically necessary to treat muscle strains, sprains, soft tissue injuries, or injuries of a similar nature.

211.     Neuromuscular re-education may be considered medically necessary if at least one of the following conditions is present and documented:

    (i)     The Insured has the loss of deep tendon reflexes and vibration sense accompanied by paresthesia, burning, or diffuse pain of the feet, lower legs, and/or fingers;

    (ii)    The Insured has nerve palsy, such as peroneal nerve injury causing foot drop; or

    (iii)   The Insured has muscular weakness or flaccidity as a result of a cerebral dysfunction, a nerve injury or disease, or has had a spinal cord disease or trauma.

212.     Virtually none of the Insureds purportedly treated by Masood and Gentle Touch presented with any of the aforementioned prerequisites which would justify neuromuscular re-education services as part of their treatment plans.

213.     Given the specific types of injury that neuromuscular re-education is intended to treat, it is likely that very few – if any – Insureds who purportedly received this treatment actually needed this treatment as a result of the relatively minor motor vehicle accidents that the Insureds purportedly sustained.

214.     Even so, and as set forth in Exhibit "1", Masood and Gentle Touch routinely purported to provide the Insureds with numerous neuromuscular reeducation services, often spanning several months, despite the fact that the Insureds did not require them.

### 7.   The Fraudulent Charges for Chiropractic Manipulations Under Anesthesia

215.     As set forth in Exhibit "1", based upon the fraudulent, predetermined "diagnoses" provided during the initial chiropractic examinations, Masood and Gentle Touch purported to subject many Insureds to chiropractic manipulations under anesthesia ("MUA").

216.     Masood and Gentle Touch submitted billing to GEICO for the purported MUA procedures as multiple charges per Insured under CPT codes 22505, 27275, 23700, 27194 and/or 27198.

217.     Like the charges for the other Fraudulent Services, the charges to GEICO for the MUAs were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the illegal kickbacks that Masood and Gentle Touch paid in coordination with John Doe Defendants "1" through "10".

218.     MUAs involve a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

219.     Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in a patient who is not sedated.

220.     MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

221.     MUA is experimental, investigational, and unproven for use on most areas of the body, including the spine, hip, shoulder, or pelvis. There is a dearth of quality supportive scientific evidence for spinal, hip, shoulder, or pelvic MUA.

222.     Little evidence exists showing the long-term benefits of MUA.

### a.     The Medically Unnecessary MUAs

223.     Virtually every Insured on whom MUAs were purportedly performed by Gentle Touch and Masood supposedly had their spine, hip(s), pelvis, and/or shoulder(s) manipulated.

224.     Given the lack of quality scientific evidence supporting the use of MUAs on the spine, hip, pelvis, or shoulder, the MUAs purportedly provided by Masood and Gentle Touch to the Insureds plainly were not medically necessary.

225.     Furthermore, MUAs should only be considered in cases where more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, has proved ineffective.

226.     This is because: (i) there is a large body of quality scientific evidence supporting the use of more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, to treat soft tissue injuries to the spine, hip, pelvis, and shoulder; (ii) there is a lack of quality scientific evidence supporting the use of MUA on the spine, hip, pelvis, or shoulder; and (iii) procedures requiring anesthesia – including MUA – involve a level of risk to the patient that is not present in procedures that do not require anesthesia.

227.     Even if MUA was a recognized form of treatment for soft tissue injuries to the spine, hip, pelvis, or shoulder – and it is not – the MUAs purportedly provided by Gentle Touch and Masood were provided without regard to whether more conservative treatment had been effective.

228.     Further to the fact that the MUAs purportedly provided by Masood and Gentle Touch were provided without regard to whether more conservative treatment had been effective is that Masood and Gentle Touch routinely recommended MUAs to Insureds within a mere three months after their motor vehicle accidents.

229.     For example:

(i)     Gentle Touch and Masood purported to provide MUAs through Gentle Touch to an Insured named DS on August 12, 2018, August 13, 2018, and August 19, 2018. In keeping with the fact that Masood and Gentle Touch did not wait until DS had failed a course of more conservative treatment prior to the MUAs, Masood and Gentle Touch purported to commence performance of the MUAs approximately one month after the date of loss of July 8, 2018, and falsely represented that "[t]here is no other conservative medical intervention, other than MUA available at this point in time to correct malalignments, joint stiffness, subluxation, fibrous adhesions and/or contracture…"

(ii)    Gentle Touch and Masood purported to provide MUAs through Gentle Touch to an Insured named DL on February 25, 2019, February 26, 2019, and March 11, 2019. In keeping with the fact that Masood and Gentle Touch did not wait until DL had failed a course of more conservative treatment prior to the MUAs, Gentle Touch and Masood purported to commence performance of the MUAs less than two months after the date of loss of December 28, 2018, and falsely represented that "[t]here is no other conservative medical intervention, other than MUA available at this point in time to correct malalignments, joint stiffness, subluxation, fibrous adhesions and/or contracture…"

(iii)   Gentle Touch and Masood purported to provide MUAs through Gentle Touch to an Insured named CH on September 23, 2018, October 7, 2018, and October 8, 2018. In keeping with the fact that Masood and Gentle Touch did not wait until CH had failed a course of more conservative treatment prior to the MUAs, Masood and Gentle Touch purported to commence performance of the MUAs less than two months after the date of loss of July 26, 2018, and falsely represented that "[t]here is no other conservative medical intervention, other than MUA available at this point in time to correct malalignments, joint stiffness, subluxation, fibrous adhesions and/or contracture…"

(iv)    Gentle Touch and Masood purported to provide MUAs through Gentle Touch to an Insured named RC on February 25, 2019, February 26, 2019, and February 28, 2019. In keeping with the fact that Gentle Touch and

Masood did not wait until RC had failed a course of more conservative treatment prior to the MUAs, Gentle Touch and Masood purported to commence performance of the MUAs less than two months after the date of loss of January 8, 2019, and falsely represented that "[t]here is no other conservative medical intervention, other than MUA available at this point in time to correct malalignments, joint stiffness, subluxation, fibrous adhesions and/or contracture…"

(v)     Gentle Touch and Masood purported to provide MUAs through Gentle Touch to an Insured named RC on September 23, 2018, October 7, 2018, and October 21, 2018. In keeping with the fact that Gentle Touch and Masood did not wait until RC had failed a course of more conservative treatment prior to the MUAs, Gentle Touch and Masood purported to commence performance of the MUAs less than two months after the date of loss of July 24, 2018, and falsely represented that "[t]here is no other conservative medical intervention, other than MUA available at this point in time to correct malalignments, joint stiffness, subluxation, fibrous adhesions and/or contracture…"

230.    In virtually every MUA claim identified in Exhibit "1", the Insureds had not failed any course of conservative treatment before Gentle Touch and Masood purported to subject them to MUAs.

231.    To the contrary, in virtually every case in which Gentle Touch and Masood purported to subject an Insured to MUA, Gentle Touch and Masood's treatment notes, or the treatment notes from other healthcare services providers who treated the Insureds, indicated that the Insureds' conditions were improving through more conservative treatments such as chiropractic manipulation without anesthesia and physical therapy.

232.    In keeping with the fact that the MUAs billed through Gentle Touch were not medically necessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, the Fee Schedule that went into effect on October 1, 2020: (i) deleted CPT code 27194; and (ii) eliminated reimbursement for services provided under CPT codes 22505 and 27198.

### b.      The Fraudulent Billing for Treatment of Non-Existent Pelvic Ring Injuries

233.    In order to maximize the amount of fraudulent billing that the Defendants could submit to GEICO for the medically unnecessary MUA procedures, Gentle Touch and Masood falsely represented that the purported MUAs involved a procedure billable under CPT codes 27194 or 27198.

234.    Pursuant to the Fee Schedule and CPT Assistant, CPT code 27194 is the code used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis or subluxation".

235.    Effective January 1, 2017, the American Medical Association replaced CPT code 27194 with CPT code 27198.

236.    Pursuant to the CPT Assistant, CPT code 27198 is the code used to bill for the treatment of "pelvic ring fracture(s), dislocation(s), diastasis or subluxation of the ilium, sacroiliac joint, and/or sacrum, with or without anterior pelvic ring factures(s) and/or dislocations(s) of the pubic symphysis and/or superior/inferior rami, unilateral or bilateral; with manipulation, requiring more than local anesthesia".

237.    Virtually none of the Insureds in the MUA claims identified in Exhibit "1" suffered from any pelvic ring fracture, dislocation, diastasis, or subluxation or – indeed – any other injury to their respective pelvic rings.

238.    Even so, and as set forth in Exhibit "1", when Gentle Touch and Masood billed GEICO for their purportedly performed MUAs using CPT code 27194 or 27198, and thereby falsely represented that the Insureds suffered from some sort of pelvic ring fracture, dislocation, diastasis, or subluxation.

239.    In keeping with the fact that none of the Insureds who purportedly received MUA in the claims identified in Exhibit "1" actually suffered from any injury to their pelvic rings, and

in keeping with the fact that none of those Insureds actually received any services from the Defendants that were billable under CPT codes 27194 or 27198, the MUA treatment notes generated by Gentle Touch and Masood routinely failed to reflect any legitimate injuries to, or treatment of, the Insureds' pelvic rings.

240. Masood and Gentle Touch's use of CPT codes 27194 and 27198 to bill for their putative MUA procedures through Gentle Touch constituted a deliberate misrepresentation of the services that were purportedly provided, so as to maximize the amount of fraudulent billing that they could submit for each purported MUA procedure.

**D.    The Fraudulent Billing for Independent Contractor Services**

241. The Defendants' fraudulent scheme also included submission of claims to GEICO on behalf of the PC Defendants seeking payment for services provided by independent contractors.

242. Under New York's no-fault insurance laws, professional corporations are ineligible to bill for or receive payments for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations or by their employees.

243. Since 2001, the New York State Insurance Department has consistently reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion Letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent

contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). See Exhibit "7."

244.    The Defendants routinely submitted charges to GEICO and other insurers for the Fraudulent Services that purportedly were performed by healthcare professionals other than Masood.

245.    The healthcare professionals working under the names of the PC Defendants worked without any supervision by Masood.

246.    The healthcare professionals working under the names of the PC Defendants set their own work schedules or had their schedules set for them by the John Does Defendants "1" through "10."

247.    The healthcare professionals working under the names of the PC Defendants did not exclusively provide services for the PC Defendants.

248.    To the extent that the Fraudulent Services were actually performed, all of the healthcare professionals other than Masood who performed any of the Fraudulent Services were treated by the Defendants as independent contractors.

249.    For example, the Defendants:

    (i)     paid the healthcare professionals, either in whole or in part, on a 1099 basis rather than a W-2 basis;

    (ii)    established an understanding with the healthcare professionals that they were independent contractors, rather than employees;

(iii)     paid no employee benefits to the healthcare professionals;

(iv)     failed to secure and maintain W-4 or I-9 forms for the healthcare professionals;

(v)      failed to withhold federal, state, or city taxes on behalf of the healthcare professionals;

(vi)     compelled the healthcare professionals to pay for their own malpractice insurance at their own expense;

(vii)    permitted the healthcare professionals to set their own schedules and days on which they desired to perform services;

(viii)   permitted the healthcare professionals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(ix)     failed to cover the healthcare professionals for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that healthcare professionals were independent contractors.

250.     By electing to treat the healthcare professionals as independent contractors, the

Defendants realized significant economic benefits. For instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.0 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the healthcare professionals.

251.    Because the healthcare professionals were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill or collect No-Fault Benefits in connection with those services.

252.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement.

253.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

## III.    The Fraudulent Billing that the Defendants Submitted or Caused to be Submitted to GEICO

254.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3s, HCFA-1500 forms, and/or treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

255.    The NF-3s, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The NF-3s, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services provided – to the extent that they were provided at all – were not medically necessary and were performed pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    The NF-3s, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided;

(iii)    The NF-3s, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between and among the Defendants and others; and

(iv)    With the exception of the NF-3s, HCFA-1500 forms, and supporting documentation covering services actually performed by Masood, the NF-3s, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

256.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

257.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

258.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

259.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

260.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent

predetermined protocols designed to maximize the charges that could be submitted to GEICO, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

261.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the healthcare professionals associated with the PC Defendants in order to prevent GEICO from discovering that the healthcare professionals performing many of the Fraudulent Services were not employed by the PC Defendants.

262.    The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

263.    The Defendants' collection efforts through numerous separate and time-consuming no-fault collection proceedings is an essential part of their fraudulent scheme as they are aware it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the New York metropolitan area.

264.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO also ensures that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner.

265.    The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $300,000.00 based upon the fraudulent charges for the Fraudulent Services.

266.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Masood and the PC Defendants**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

267.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

268.     There is an actual case and controversy between GEICO, Masood, and the PC Defendants regarding more than $1,500,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO through the PC Defendants.

269.     Masood and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

270.     Masood and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

271.     Masood and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between and among the Defendants and others.

272.     Masood and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants.

273.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Masood and the PC Defendants have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO under the names of the PC Defendants.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Masood**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

274.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

275.     Gentle Touch is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

276.     Masood knowingly has conducted and/or participated, directly or indirectly, in the conduct of Gentle Touch's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Gentle Touch was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were

provided in order to inflate the charges that could be submitted; (iv) Gentle Touch obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Gentle Touch's employees. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

277.    Gentle Touch's business is racketeering activity, inasmuch as the enterprise existed for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud were the regular way in which Masood operated Gentle Touch, insofar as Gentle Touch was not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud were essential in order for Gentle Touch to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Gentle Touch to the present day.

278.    Gentle Touch is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Gentle Touch in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

279.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Gentle Touch.

280.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Masood and John Doe Defendants "1" through "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

281.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

282.     Gentle Touch is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

283.     Masood and John Doe Defendants "1" through "10" are employed by or associated with the Gentle Touch enterprise.

284.     Masood and John Doe Defendants "1" through "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Gentle Touch's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Gentle Touch was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Gentle Touch obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided –

to the extent that they were provided at all – by independent contractors, rather than by Gentle Touch's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

285.    Masood and John Doe Defendants "1" through "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

286.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Gentle Touch.

287.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Masood and Gentle Touch**
**(Common Law Fraud)**

288.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

289.    Masood and Gentle Touch intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

290.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Gentle Touch was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients

through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Gentle Touch and Masood; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Gentle Touch, when in fact many of the billed-for services were provided by independent contractors.

291.    Masood and Gentle Touch intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Gentle Touch that were not compensable under the New York no-fault insurance laws.

292.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through Gentle Touch.

293.    Masood and Gentle Touch's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

294.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against Masood and Gentle Touch**
**(Unjust Enrichment)**

295.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

296.     As set forth above, Masood and Gentle Touch have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

297.     When GEICO paid the bills and charges submitted by or on behalf of Gentle Touch for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Gentle Touch and Masood's improper, unlawful, and/or unjust acts.

298.     Masood and Gentle Touch have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Masood and Gentle Touch voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

299.     Masood and Gentle Touch's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

300.     By reason of the above, Masood and Gentle Touch have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $150,000.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1" through "10"**
**(Aiding and Abetting Fraud)**

301.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

302.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Masood and Gentle Touch.

303. The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

304. The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Masood or Gentle Touch to obtain payment from GEICO and other insurers.

305. John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Masood and Gentle Touch for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

306. The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $150,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Gentle Touch.

307. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

308. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Masood
### (Violation of RICO, 18 U.S.C. § 1962(c))

309.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

310.    Masood Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

311.    Masood knowingly has conducted and/or participated, directly or indirectly, in the conduct of Masood Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Masood Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Masood Chiropractic obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Masood Chiropractic's employees. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2."

312.     Masood Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Masood operates Masood Chiropractic, insofar as Masood Chiropractic is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Masood Chiropractic to function.

313.     Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Masood Chiropractic to the present day.

314.     Masood Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Masood Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

315.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Masood Chiropractic.

316.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Masood and John Doe Defendants "1" through "10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

317. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

318. Masood Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

319. Masood and John Doe Defendants "1" through "10" are employed by or associated with the Masood Chiropractic enterprise.

320. Masood and John Doe Defendants "1" through "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Masood Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Masood Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Masood Chiropractic obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Masood Chiropractic's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to

GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2."

321.    Masood and John Doe Defendants "1" through "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

322.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Masood Chiropractic.

323.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Against Masood and Masood Chiropractic**
**(Common Law Fraud)**

324.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

325.    Masood and Masood Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

326.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Masood Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for

services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Masood Chiropractic and Masood; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Masood Chiropractic, when in fact many of the billed-for services were provided by independent contractors.

327.    Masood and Masood Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Masood Chiropractic that were not compensable under the New York no-fault insurance laws.

328.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Masood Chiropractic.

329.    Masood and Masood Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

330.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Masood and Masood Chiropractic
### (Unjust Enrichment)

331.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

332.     As set forth above, Masood and Masood Chiropractic have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

333.     When GEICO paid the bills and charges submitted by or on behalf of Masood Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

334.     Masood and Masood Chiropractic have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Masood and Masood Chiropractic voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

335.     Masood and Masood Chiropractic's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

336.     By reason of the above, Masood and Masood Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $150,000.00.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against John Doe Defendants "1" through "10"
### (Aiding and Abetting Fraud)

337.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

338.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Masood and Masood Chiropractic, participating and

assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to genuine patient care.

339. The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

340. The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Masood or Masood Chiropractic to obtain payment from GEICO and other insurers.

341. John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Masood and Masood Chiropractic for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

342. The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $150,000.00 pursuant to the fraudulent bills submitted for the Fraudulent Services through Masood Chiropractic.

343. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

344. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**JURY DEMAND**

345. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A. On the First Cause of Action against Masood and the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Masood and the PC Defendants have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B. On the Second Cause of Action against Masood, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Masood and John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Masood and Gentle Touch, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Masood and Gentle Touch, more than $150,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Masood, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Masood and John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Masood and Masood Chiropractic, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Masood and Masood Chiropractic, more than $150,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$150,000.00 together with punitive damages, costs, interest, and such other and further relief as this

Court deems just and proper.

Dated: March 4, 2022
       Uniondale, New York

                        RIVKIN RADLER LLP

                        By:     */s/ Michael Sirignano*
                              Barry I. Levy (BL 2190)
                              Michael A. Sirignano (MS 5263)
                              Sean Gorton (SG 9310)
                        926 RXR Plaza
                        Uniondale, New York 11556
                        (516) 357-3000
                        RR File:  5100-3274
                        *Counsel for Plaintiffs Government Employees*
                        *Insurance Company, GEICO Indemnity Company,*
                        *GEICO General Insurance Company and GEICO*
                        *Casualty Company*